Jonathan Gardner (*pro hac vice* forthcoming)
Carol C. Villegas (*pro hac vice* forthcoming)
Jonathan D. Waisnor (*pro hac vice* forthcoming)
James M. Fee (*pro hac vice* forthcoming)
Danielle Izzo (*pro hac vice* forthcoming)
**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Fl.
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
cvillegas@labaton.com
jwaisnor@labaton.com
jfee@labaton.com
dizzo@labaton.com

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ADRIEL VALDEZ<br><br>　　　　Plaintiff, on behalf of himself and all others similarly situated<br><br>　　　　　v.<br><br>LG ELECTRONICS U.S.A., INC.<br><br>　　　　　Defendant. | Civil Action No.: 1:25-cv-08818<br><br><br>**CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................. 1

PARTIES ........................................................................................................... 3

JURISDICTION AND VENUE ........................................................................... 4

FACTUAL BACKGROUND ............................................................................... 4

I.    LG WAIVED THEIR RIGHT TO ARBITRATION BY REFUSING TO PAY ITS
PORTION OF THE FILING FEES CAUSING ADMINISTRATIVE CLOSURE OF
ALL ARBITRATIONS FILED WITH JAMS ................................................... 4

    A.    Relevant Procedural History ............................................................... 4

    B.    Plaintiff Provided LG with Sufficient Notice of His Claim ................. 6

    C.    Plaintiff Filed an Individual Arbitration Demand that AAA Determined Met
the Initial Filing Requirements ............................................................ 7

    D.    LG Waived Arbitration ......................................................................... 8

II.    BIOMETRICS AND CONSUMER PRIVACY ................................................ 8

    A.    Facial Recognition Technology and Facial Processing Systems ......... 12

    B.    Deep-Learning Facial Recognition and Processing Techniques .......... 14

III.    ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT ....................... 15

IV.    LG'S CAMERA, SMART FEATURES, AND OTHER PROPRIETARY
TECHNOLOGY GENERATE, COLLECT, AND STORE THE BIOMETRICS OF
LG USERS IN VIOLATION OF ILLINOIS LAW ......................................... 17

    A.    LG's Camera and Smart Features Collect and Store Claimant's Biometric Data 17

    B.    LG Does Not Provide Notice of Its Use of Facial Processing and Recognition
Techniques or Technology as Required Under BIPA ............................ 29

    C.    LG's BIPA Violations Expose Claimant to Threats of Serious Harm ... 31

V.    PLAINTIFF'S EXPERIENCE WITH LG DEVICES ..................................... 32

CLASS ALLEGATIONS ................................................................................... 33

COUNT I  VIOLATION OF THE ILLINOIS BIOMETRIC INFORMATION PRIVACY
    ACT (VIOLATION OF 740 ILCS 14/15(A)) .................................................................. 35

COUNT II  VIOLATION OF THE ILLINOIS BIOMETRIC INFORMATION PRIVACY
    ACT (VIOLATION OF 740 ILCS 14/15(B)).................................................................. 36

COUNT III  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE
    PRACTICES ACT,  BASED ON LG'S BIPA VIOLATION (VIOLATION OF 815
    ILCS 505/10A(C)) ........................................................................................................ 38

PRAYER FOR RELIEF ........................................................................................................... 39

JURY TRIAL ............................................................................................................................ 40

Plaintiff Adriel Valdez ("Plaintiff"), individually and on behalf of persons similarly situated (hereinafter collectively referred to as the "Class"), bring this class action against LG Electronics U.S.A., Inc.'s ("LG" or "Defendant") to put a stop to Defendant's surreptitious collection, use, storage, and disclosure of Plaintiff's and the proposed Class members' sensitive biometric data in violation of Illinois' Biometric Information Privacy Act ("BIPA").

## NATURE OF THE ACTION

1. Plaintiff brings this Class Action Complaint on behalf of Illinoisans harmed as a result of LG's surreptitious collection, use, storage, and disclosure of their highly sensitive biometric identifiers and/or biometric information (collectively, "Biometrics"), specifically, the "face templates" created from their unique facial geometry.

2. LG is the designer, manufacturer, and vendor of LG smartphones including the Stylo 6, Velvet, LG V 40 ThinQ, Stylo 4, V 35 ThinQ, G7 ThinQ, V30, Stylo3/Stylus 3, V20, Tribute 5 or K7, Stylo 2 or Stylus 2, G5, V10, G4 Stylus, G Stylo, G4, G3, Volt, G Flex, Nexus 5, Nexus, Lucid, Spectrum, G2, Optimus, LG Wing 5G, LG K92, LG Expression Plus3, LG Velvet, LG Phoenix, LG V60 ThinQ, LG Neon, LG G8X ThinQ, LG K40, LG Xpression Plus 2, LG Arena 2, LG Prime 2, LG Stylo 5, and LG G8 ThinQ (hereinafter "LG Devices").

3. The LG Devices at issue are manufactured and sold with LG's high-powered camera, camera features, and default gallery app, all of which utilize facial processing and recognition technology and techniques before, during, and after images are captured.[1]

---

[1] *See, e.g.,* Patent No.: US 10,375,219 B2: Mobile Terminal Releasing a Locked State and Method for Controlling the Same (Aug. 6, 2019) ("FIG. 11 shows an input of a control command to change an ***image sorting through a face recognition, to an execution screen of a gallery applicatio***n. Referring to FIG. 11, in a state that a list 1101 of a plurality of thumbnail images is output without a specific sorting reference as a gallery application is executed, a user's pickup gesture may occur, and then a face detection and a face recognition may be performed. As a result, the list 1101 may be changed into a list 1102 of photo images including the recognized face, according to a subsequent face gesture (e.g., a nodding gesture)") (emphasis added); Patent No.: US 11,250, 869 B2: Audio Zoom Based on Speaker Detection Using Lip Reading (Feb. 15, 2022) ("After facial recognition is performed in a cloud server or edge

4.     Not only does LG use facial recognition to recognize faces in the user's camera frame, photo gallery, and contacts, but it also uses facial recognition to detect faces through LG's "smart features."

5.     Unbeknownst to users, LG uses facial processing techniques and facial recognition technology on each photograph captured and saved by the LG Device's camera and smart features. LG's algorithm automatically scans and analyzes each image to determine whether a face is present. Once a face is detected, the algorithm analyzes and extracts the subject's unique facial landmarks, such as the distance between the eyes, chin shape, location of the mouth, ears and eyebrows, to create a unique digital representation known as a "face template" or "face map" based on the identified individual's geometric attributes such as distance between the eyes and the width of the nose.[2]

6.     Each face template is stored in a facial recognition database on, at least, the user's LG Device in the solid state memory, and then compared against the other stored face templates to determine whether there is a match.

7.     LG does not notify Illinois users that LG is generating, collecting, using, and storing their Biometrics.

---

computing environment, the result of facial recognition may be transferred to the electronic device. Or, facial recognition may be performed by applying a deep learning model to an image captured by the electronic device. […] *FIG. 9 is a view illustrating an example of detecting a speaker's utterance based on a variation in the mouth shape based on facial recognition*. Referring to FIG. 9, even the position of the mouth may be identified in the face recognized via an ANN. The ANN may be a model trained to detect variations in the shape of the mouth. *The ANN for facial recognition may detect a person's lips and extract feature points F1, F2…F10 from the detected lips.*") (emphasis added).

[2] *See, e.g.,* Patent No. US 10,863,216 B2: Terminal Using Intelligent Analysis for Decreasing Playback Time Of Video (Dec. 8, 2020) ("As another example, the learning data unit 130 may detect facial elements and recognize the face 571. Specifically, the learning data unit 130 may pre-acquire the locations of the facial elements such as eyes, nose and mouth, calculate feature vectors between the elements, and detect the face 571...(219) The learning data unit 130 extracts the facial region from the recognized face (S542). The learning data unit 130 may extract the facial region 572 corresponding to the recognized face. The learning data unit 130 extracts a plurality of feature points from the extracted facial region (S543). In one embodiment, each of the plurality of feature points may be extracted from each of the facial elements (eyes, nose, mouth, eyebrows, forehead, etc.). Each of the plurality of feature points may be a reference point extracted in order to acquire the contour of the face.")

8.     LG does not disclose its Biometric collection to its users, nor does it ask users to acknowledge, let alone consent, to these practices.

9.     Plaintiff brings this Class Action Complaint on behalf of himself and all individuals who had their biometric information and/or biometric identifiers collected, captured, received, otherwise obtained, or disclosed by LG while residing in Illinois during the applicable statutory period.

10.     LG's actions constitute an invasion of Plaintiff's and Class members' right to privacy and violate the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1- 99. LG violated BIPA because it did not:

(a)     Properly inform Plaintiff or the Class in writing that their biometric identifiers (face geometry) were being generated, collected, or stored;

(b)     Properly inform Plaintiff or the Class in writing of the specific purpose and length of time for which their biometric identifiers were being collected, stored, and used;

(c)     Provide a publicly available retention schedule and guidelines for permanently destroying the biometric identifiers of Plaintiff and the Class; or

(d)     Request or receive a written release from Plaintiff or the Class to collect, capture, or otherwise obtain their biometric identifiers.

11.     Accordingly, this Complaint seeks an order: (i) declaring that LG's conduct violates BIPA, (ii) requiring LG to cease the unlawful activities discussed herein, and (iii) awarding statutory damages to Plaintiff and the proposed Class.

## PARTIES

12.     Plaintiff Adriel Valdez is a natural person who, during the Class Period, owned an LG mobile device, took photographs on such device of himself, including photographs of his face

and other physical attributes, and used LG's various camera features while residing in the State of Illinois.

13.     LG Electronics U.S.A., Inc.'s is a Delaware corporation with its principal place of business at 111 Sylvan Avenue, Englewood Cliffs, New Jersey, 07632. LG is responsible for manufacturing LG Devices and conducts significant business throughout the state of Illinois and the United States, including through the manufacturing, sale, and shipment of LG Devices.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this dispute under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and Plaintiff and the putative Class members are citizens of a different state than Defendant.

15.     This Court has personal jurisdiction over LG because it regularly conducts business in Illinois and a substantial part of the harm, events, and conduct giving rise to Plaintiff's claims occurred in Illinois.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because LG transacts business in this District and a substantial portion of the events giving rise to acts alleged in this Complaint occurred in, or emanated from, this District.

## FACTUAL BACKGROUND

### I.     LG WAIVED THEIR RIGHT TO ARBITRATION BY REFUSING TO PAY ITS PORTION OF THE FILING FEES CAUSING ADMINISTRATIVE CLOSURE OF ALL ARBITRATIONS FILED WITH JAMS

### A.     Relevant Procedural History

17.     The LG Devices at issue feature notices referring to LG's binding Arbitration Provision on the exterior of the device boxes and inside the product packaging, including in the "Limited Warranty" and device user guides.

18.     The language on the exterior of the box says that "[t]he complete Product Safety and Warranty Brochure including a binding arbitration agreement is located inside the product packaging and is also available at http://www.lg.com/us/mobile-phones/arbitration/legalterms." *Id.* The hyperlink directs the user to the same "Limited Warranty" Arbitration Provision applicable to Plaintiff's claims and available via the LG's website.

19.     The Arbitration Provision requires LG users, including the Plaintiff and members of the putative Class, to individually arbitrate any claim "arising out of or relating in any way" to the sale, condition, or performance from the LG Devices, including claims that LG's technology surreptitiously generates and collects Plaintiff's biometric data in violation of Illinois law.

20.     The Arbitration Provision further expressly requires LG to pay ***all*** arbitration filing, administration, and arbitrator fees necessary to commence arbitration, including payment of Plaintiff's portion of the filing fees:

> Upon receipt of your written demand for arbitration, LG will promptly pay all arbitration filing fees to the AAA unless you seek more than $25,000 in damages, in which case the payment of these fees will be governed by the AAA Rules. Except as otherwise provided for herein, LG will pay all AAA filing, administration and arbitrator fees for any arbitration initiated in accordance with the AAA Rules and this arbitration provision.

21.     The Arbitration Provision also requires the arbitration be administered by AAA under AAA's Consumer Arbitration Rules applicable to consumer disputes ("Consumer Rules"). Those Rules, in turn, authorize AAA to require that each party pay filing fees before AAA will empanel an arbitrator and proceed with the parties' arbitration.

22.     In August 2021, AAA issued its Mass Arbitration Supplementary Rules for Multiple Case Filings ("Supplementary Rules") and Multiple Consumer Case Filing Fee Schedule to provide parties and their representatives with an efficient path toward the resolution of multiple individual disputes. The Supplementary Rules were developed by AAA with the intent to

streamline the administration of large volume filings involving the same party, parties, and party representatives.

23.     The Consumer Rules state that AAA's Supplementary and Multiple Consumer Case Filing Fee Schedule applies where, as here, twenty-five or more similar claims for arbitration are filed against the same party and counsel for the parties is consistent across all cases.  Further, the Multiple Consumer Case Filing Fee Schedule states that the business's share of the filing fees is due as soon as the AAA confirms in writing that the individual filing meets the filing requirements, even if the matter is settled or withdrawn.

       **B.**     **Plaintiff Provided LG with Sufficient Notice of His Claim**

24.     Under LG's Arbitration Provision, an individual must notify LG in writing of the alleged dispute thirty (30) days before commencing the arbitration.

25.     Therefore, on January 6, 2023, Plaintiff notified LG of his intent to pursue individual arbitrations for violations of BIPA.

26.     On March 7, 2023, the parties agreed to go to mediation and entered into a tolling agreement to preserve Plaintiff's claims while LG continued investigating the allegations against it.

27.     On July 12, 2023, the parties held a mediation before Robert Meyer of JAMS. The mediation was unsuccessful.

28.     Thereafter, counsel for Plaintiff indicated it would file individual arbitrations with AAA after the expiration of the tolling period, which was agreed to be the later of 60 days after the agreement's execution or the conclusion of mediation.

**C.    Plaintiff Filed an Individual Arbitration Demand that AAA Determined Met the Initial Filing Requirements**

29.    On September 20, 2023, in accordance with AAA's Supplementary Rules, Plaintiff's counsel filed his claim along with 2,437 others (hereinafter, "Claimants").

30.    On October 6, 2023, AAA notified the parties that LG failed to follow the policies outlined in AAA's Consumer Due Process Protocol ("Protocol") and Consumer Rules, which required LG to register its arbitration clause with the AAA's Consumer Clause Registry ("Registry"). Due to LG's non-compliance, AAA could not accept the Claimants' filings and requested LG complete registration by October 13, 2023.

31.    Counsel for LG responded to AAA on October 12, 2023, explaining that it "previously registered its arbitration clause with AAA and will submit its renewal fee payment."

32.    On December 29, 2023, AAA confirmed that Plaintiff and each of the 2,438 Claimants had met the AAA's requirements and issued an invoice to LG for its filing fees.

33.    In response, on January 2, 2024, LG notified AAA that it was "not obligated" to pay its filing fees in connection with the Claimants' demands based, in part, on LG's purported opinion that: (i) the Arbitration Provision "did not permit 'mass' arbitrations of combined or consolidated claims"; (ii) Claimants' failed to demonstrate that LG's Arbitration Provision binds them; and (iii) AAA lacked authority to resolve the dispute as to the arbitrability.  LG conveyed, again contradictorily – that the only way it would participate in the arbitrations was if Claimants' counsel agreed to proceed on a "bellwether" basis and advance LG's portion of the filing fees.

34.    On January 12, 2024, Claimants' counsel responded to LG's refusal to abide by AAA's Rules, AAA's Supplementary Rules, and its own Arbitration Provision, as well as LG's baseless assertion that Claimants violated LG's Arbitration Provision by following AAA's

mandatory filing requirements and further reiterated that LG's refusal to pay its filing fees constituted a material breach of its mandatory, self-imposed Arbitration Provision.

35.     The AAA noted LG's refusal to pay its filing fees on January 23, 2024 and requested confirmation from Claimants about whether they would advance LG's portion of the fees.

36.     On January 29, 2024, Claimants declined to advance LG's fees. However, Claimants offered to follow AAA's revised rules, effective January 15, 2024 ("Revised Rules), requiring payment of only the initiation fees in exchange for AAA's appointment of a process arbitrator to decide LG's threshold objections. Under the revised rules, the initial fee for individuals is $3,125 and $8,125 for LG.

37.     LG responded on February 6, 2024, reaffirming that it would not pay its fees or agree to proceed under the AAA's Revised Rules.

38.     Upon receipt of the above letters, on February 8, 2024, the AAA administratively closed all cases due to nonpayment by LG.

39.     LG violated AAA's requirements and breached its contractual obligation to arbitrate Claimants' claims, allowing the Plaintiff to pursue this case in Court.

**D.     LG Waived Arbitration**

40.     LG waived its right to arbitration by refusing to pay the required filing fees.

41.     In waiving its right to arbitration, LG has agreed to proceed in a court with jurisdiction to award the damages sought and to provide injunctive relief.

## II.     BIOMETRICS AND CONSUMER PRIVACY

42.     "Biometrics" refers to measurable characteristics or processes used for identification.  As a characteristic, biometrics is defined as "a measurable biological (anatomical

and physiological) and behavioral characteristic that can be used for automated recognition."[3]  As a process, biometrics is defined as "automated method[s] of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics."[4]

43.     Biometrics are used to identify individuals based on unique, distinctive, and measurable characteristics or features known as "biometric identifiers." [5,6]

44.     "Biometric identifiers" are categorized by physiological and behavioral characteristics.  Examples include, but are not limited to, face or hand geometry, fingerprints, palm prints, irises, retinas, veins, and DNA sequences.   Behavioral based biometric identifiers "are apparent in a person's interaction with the environment, such as signatures, gaits, and keystroke,"[7] while "[v]oice/speech contains both behavioral features, such as accent, and physiological features, such as voice pitch."[8]

45.     Biometric technologies vary widely depending on the biometric identifier.  Modern era biometric processes include face recognition; fingerprint recognition; hand geometry; retina

---

[3] National Science & Technology Council, *Biometrics "Foundation Documents"* (Sept. 2006), https://apps.dtic.mil/sti/pdfs/ADA505048.pdf.

[4] *Id.*

[5] "Biometrics: A general term used alternatively to describe a characteristic or a process: As a characteristic: A measurable biological (anatomical and physiological) and behavioral characteristic that can be used for automated recognition. As a process: Automated methods of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics." *Biometrics Foundation Documents,* NSTC Subcommittee on Biometrics (2009). A biometric is any measurable, robust, distinctive, physical characteristic or personal trait of an individual that can be used to identify, or verify the claimed identity of, that individual. Measurable means that the characteristic or trait can be easily presented to; Sushma Jaiswal, *et al.*, *BIOMETRIC: CASE STUDY,* J. GLOBAL RESEARCH IN COMPUTER SCIENCE (Oct. 2011), https://www.rroij.com/open-access/biometric-case-study-19-49.pdf ("A biometric is any measurable, robust, distinctive, physical characteristic or personal trait of an individual that can be used to identify, or verify the claimed identity of, that individual. Measurable means that the characteristic or trait can be easily presented to a sensor and converted into a quantifiable, digital format. This allows for the automated matching process to occur in a matter of seconds."); Stephen Mayhew, *History of* Biometrics (Feb.1, 2018), https://www.biometricupdate.com/201802/history-of-biometrics-2; *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017) ("Biometrics" refers to "biology-based set[s] of measurements").

[6] Jaiswal *supra* note 5.

[7] *Id.*

[8] *Id.*

9

scan; iris scan; voice recognition; vascular or vein recognition; skin texture; DNA;[9] dynamic

signature verification;[10] keystroke dynamics; and gait analysis.

46.     One of the most prevalent uses of biometrics is in facial recognition technology,

which records the "spatial geometry" or more commonly known as "facial geometry" of

distinguishing features of the face.[11]   These distinguishing features include the nose, eyes,

eyebrows, mouth, chin, and lips.[12]   The graphic in <u>Figure 1</u> below illustrates the way "face

geometry" is commonly used to refer to the location and spatial relationships between the

distinguishing features.



*Fig. 1[13]*

47.     Facial recognition technology works by: (1) scanning[14] a photograph and/or digital

image to detect a human face, (2) extracting the distinguishing facial features, such as the nose,

[9] *The National Biometrics Challenge*, NATIONAL SCIENCE AND TECHNOLOGY COUNCIL SUBCOMMITTEE ON BIOMETRICS AND IDENTITY MANAGEMENT at 14 (September 2011), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/biometricschallenge2011.pdf
[10] Stephen Mayhew, Explainer: *Dynamic Signature*, Biometric Update.com (June 20, 2012), http://www.biometrics.gov/Documents/DynamicSig.pdf
[11] *Face Recognition*, Biometric Solutions, https://www.biometric-solutions.com/face-recognition.html
[12] Jaiswal  *supra* note 5.
[13]  Daniel Thomas, *Future airports could become hi-tech pleasure dome,* BBC NEWS (Feb. 2, 2015), https://www.bbc.com/news/business-30830296
[14] A software program can be said to "scan" a digital image to detect a face by identifying key facial landmarks or features such as the nose, mouth, eyes and chin. *See* Peter N. Belhumeur, *Localizing Parts of Faces Using a Consensus of Exemplars,* 2011 IEEE CONFERENCE ON COMPUTER VISION AND PATTERN RECOGNITION (CPVR*)* at 546 (2011),

eyes, mouth, chin, ear, and their relative portions in the digital image that are based on specific details about the face geometry as determined by facial points and contours and their relative portions in the digital image, (3) generating a face "template," (or "faceprint"), and (4) comparing the resulting "face template" to the face templates stored in a "faceprint database" for identification.[15]

48.     The recent sophistication of facial recognition software has generated many commercial applications of the technology but has also raised serious privacy concerns about its massive scale, scope, and surreptitiousness.[16]

49.     The use of biometric data presents unique risks. Biometric data is one of the most sensitive forms of personal information because—unlike other types of data such as account or ID numbers—biometric data cannot be changed if stolen or compromised.  Once a person's unique and permanent biometric identifiers are exposed, he/she has no way to prevent identity theft and unauthorized tracking.

50.     Proprietary biometric data collected by companies—especially those who collect it unlawfully and without permission—can be leaked, hacked, exposed, or otherwise exploited, as demonstrated by the highly publicized Clearview AI data breach and the Cambridge Analytica scandal.

---

nk_cvpr2011_faceparts.pdf ("Many fiducial point detectors include classifiers that are trained to respond to a specific fiducial (e.g., left corner of the left eye). These classifiers take as input raw pixel intensities over a window or the output of a bank of filters (e.g., wavelets, Gaussian Derivative filters, Gabor filters, or Haarlike features). These local detectors are scanned over a portion of the image and may return one or more candidate locations for the part or a "score" at each location.").

[15] Biometric Solutions, *supra* note 11.

[16] *What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing Before the Subcomm. on Privacy Tech & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012) (statement of Jennifer Lynch, Staff Attorney, Electronic Frontier Foundation), https://www.eff.org/files/filenode/jenniferlynch_eff-senate-testimony-face_recognition.pdf.

51.     Due to the clear potential for invasion of privacy by companies who gather biometric data, the Federal Trade Commission ("FTC") urged companies using facial recognition technology and collecting biometric data to ask for clear consent before scanning and extracting biometric data from their digital photographs.[17]

52.     In the Summer of 2015, the National Telecommunications and Information Administration ("NTIA") held a workshop in an attempt to create a code of conduct for the use and operation of facial recognition technology. Present at the meeting were trade associations representing some of the largest technology companies in the world, including companies like Google and Microsoft, as well as advocates, experts, and members of the public interest community.  But these talks quickly fell through—ending with the entire public interest community staging a walk out before the meeting had ended—because not a single technology trade association "would agree that before you use facial recognition to identify someone by name, even if you don't have any relationship with that person, you need to get their consent."[18]

53.     Companies have only continued to exploit facial recognition technology and the use of biometric data.  For example, for eight years, RiteAid deployed facial recognition systems in largely lower-income, non-white neighborhoods, allegedly to target these demographics specifically.[19] Such continued abuses of facial recognition technology and biometric data led to the enactment of the Illinois Biometric Information Privacy Act.

### A.     Facial Recognition Technology and Facial Processing Systems

54.     Facial recognition technology is one form of technology that processes faces.

---

[17] *See Facing Facts: Best Practices for Common Uses of Facial Recognition Technologies*, FEDERAL TRADE COMMISSION (Oct. 2012), https://www.ftc.gov/sites/default/files/documents/reports/facing-facts-best-practices-common-uses-facial-recognition-technologies/121022facialtechrpt.pdf.

[18] April Glaser, *Biometrics Are Coming, Along With Serious Security Concerns*, WIRED (Mar. 9, 2016), https://www.wired.com/2016/03/biometrics-coming-along-serious-security-concerns/.

[19] Jeffrey Dastin, *Rite Aid deployed facial recognition systems in hundreds of U.S. stores*, REUTERS, https://www.reuters.com/investigates/special-report/usa-riteaid-software/

55.    There are three main categories of facial processing technology: (1) facial detection; (2) facial analysis; and (3) facial recognition or identification.

56.    Facial detection determines whether the image contains a face and can also be used to determine whether or where any face is present.

57.    Facial analysis technology enables the detection of various facial characteristics, also known as landmark features.  Facial analysis enables facial recognition by comparing an individual's facial features to available images for verification or identification purposes.[20]

58.    Facial recognition technology confirms a photo matches a different photo of the same person in a facial template database.

59.    Facial recognition technology is based on algorithms that learn how to recognize human faces and the hundreds of ways in which each one is unique.

60.    These algorithms create a unique "face template" of a person's facial geometry by scanning, identifying, and measuring various facial landmarks, such as the location of the mouth, chin, nose, ears, eyes, and eyebrows.

61.    To automatically extract face templates from new images, a facial recognition algorithm must be "trained" to identify and measure the relevant facial landmarks.

62.    This is typically accomplished by the algorithm evaluating "triplet" sets of photographs—i.e., two images of the same person (known as the "anchor" and "positive sample"), and one of a completely different person (known as the "negative sample").

63.    The algorithm reviews the measurements collected from each image and then adjusts itself so that the measurements collected from the anchor sample are closer to those

---

[20] Testimony provided on Feb. 6, 2020, by Dr. Charles H. Romine, Director, Information Technology Laboratory, National Institute of Standards and Technology, , U. S. Department of Commerce, to the Committee on Homeland Security, U.S. House of Representatives, https://www.nist.gov/speech-testimony/facial-recognition-technology-frt.

collected from the positive sample, and further apart from those collected from the negative sample.

64.     After repeating this process a few times, the algorithm learns to reliably scan for and collect a face template of the geometry of any given face.

### B.     Deep-Learning Facial Recognition and Processing Techniques

65.     Biometric recognition methods utilize deep learning-based models to provide an end-to-end learning framework, which can jointly learn the feature representation while performing classification.  This is achieved through a multi-layer neural network, also known as Deep Neural Networks ("DNN"), to learn multiple levels of representations that correspond to different levels of abstraction, which is better suited to uncover underlying patterns of the data.

66.     Facial recognition is a biometric technology that identifies facial vectors and features and matches them to an individual pre-enrolled in a database.  In the mid-2000s, the technology based on digital signal processing techniques ("DSP") was restricted to frontal-facing images.  However, more recently, there has been a dramatic improvement in precision advancements of artificial technologies ("AI") based DNNs leading to the development of an AI-based facial recognition engine.  AI-based facial recognition technology leverages proprietary AI algorithms and mathematical equations to make its connections to individuals by measuring a number of facial variables, such as nose depth and width, forehead length, and eye shape, and saves the information as a template.  The template generated for an individual is used as a basis for comparison to confirm identity if there is a match with an existing template.

67.     The key features of a facial recognition engine are face detection, face feature extraction, and face recognition.  Face detection is the first step the technology takes to detect a face.  Face detection works by scanning the entire image, video, and/or scene to determine if the frame contains full or partial human faces.  Once a face is detected, the engine extracts a n-

dimensional vector set creating a face template from the face image. The face template that is extracted from the individual's face is used for matching or searching. The newly extracted face template is then matched to pre-existing templates in a database. A 1:N search is performed by matching an individual's template to the entire database to find the best match and confirm identity.

## III. ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT

68. The Illinois Legislature determined that "[b]iometrics are unlike other unique identifiers" such as social security numbers, which can be changed if compromised. 740 ILCS 14/5(c). "Biometrics . . . are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *Id.*

69. In 2008, to protect Illinois residents from the surreptitious collection and use of their biometric data, the Illinois Legislature enacted BIPA.[21] Under BIPA:

> (b) No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:
>
> > (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
> >
> > (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
> >
> > (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.
>
> . . .

---

[21] In passing BIPA, the Illinois Legislature found that "[a]n overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances and other personal information" (740 ILCS § 14/5(d)); and "[t]he full ramifications of biometric technology are not fully known" (*Id.* § 14/5(f)); and (4) "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information" (*id.* § 14/5(g)).

(d) No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless:

(1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure[.]

740 ILCS 14/15(b) and (d)(1).

70.     BIPA applies to entities that interact with two forms of biometric data: "biometric identifiers"[22] and "biometric information." 740 ILCS 14/15(a)-(e).

71.     "Biometric identifiers" means "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry."  740 ILCS 14/10.  However, BIPA only provides a non-exhaustive list of biometric identifiers, and the legislative intent behind BIPA was to protect Illinois residents from irreputable harm by placing strict requirements on companies regarding the collection, usage, storage, retention, and destruction of unique and highly sensitive biometric identifiers and information.

72.     "A person cannot obtain new DNA or new fingerprints or new eyeballs for iris recognition, at least not easily or not at this time.  Replacing a biometric identifier is not like replacing a lost key or a misplaced identification card or a stolen accesscode.  The Act's goal is to prevent irretrievable harm from happening and to put inplace a process and rules to reassure an otherwise skittish public." *Sekura v. Krishna Schaumburg Tan, Inc.*, 115 N.E.3d 1080, 1093 (Ill. App. Ct. 2018), *appeal denied*, 119 N.E.3d 1034 (Ill. 2019).

73.     "Biometric information" consists of biometric identifiers used to identify an individual.  BIPA defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to

---

[22] "Biometric identifiers" are categorized by physiological and behavioral characteristics.  Examples include, but are not limited to, voiceprints, face or hand geometry, fingerprints, palm prints, iris patterns, retina patterns, veins, and DNA sequences.

identify an individual." *Rivera*, 238 F. Supp. 3d at 1095 (N.D. Ill. 2017) ("The Act also bans the non-consensual collection and storage of **information . . . that is 'based on' those biometric identifiers**.") (emphasis added).[23]

74.    BIPA imposes various requirements on private entities that collect or maintain biometric data and requires a company to develop a publicly available written policy establishing a retention schedule and guidelines for permanently destroying biometric data when the initial purpose for collecting such data has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first.  740 ILCS 14/15(a).

75.    Under BIPA, [a] prevailing party may recover: (1) against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages, whichever is greater; (2) against a private entity that intentionally or recklessly violates a provision of this Act, liquidated damages of $5,000 or actual damages, whichever is greater; (3) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses; and (4) other relief, including an injunction, as the State or federal court may deem appropriate." 740 ILCS 14/20(a).

IV.    **LG'S CAMERA, SMART FEATURES, AND OTHER PROPRIETARY TECHNOLOGY GENERATE, COLLECT, AND STORE THE BIOMETRICS OF LG USERS IN VIOLATION OF ILLINOIS LAW**

A.    **LG's Camera and Smart Features Collect and Store Claimant's Biometric Data**

76.    The LG Devices at issue are manufactured and sold with LG's high-powered

---

[23] *See also In re Clearview Privacy Litig.,* 585 F. Supp. 3d 1111, 1122-23  (N.D. Ill. 2022) (Coleman, S.) *citing Flores v. LG Solutions, Inc.*, No. 21-cv-1128, 2021 WL 232627, at *3 (N.D. Ill. Jan. 8, 2021) (Norgle, J.) ("The Court cannot say that those protections do not apply to any publicly published photographs of individuals—especially given that the biometric data in this case is the facial geometry of the class members, in contrast to the photos themselves."); *Rivera*, 238 F. Supp. 3d at 1096 ("'biometric identifier' is not the underlying medium itself, or a way of taking measurements, but instead is a set of measurements of a specified physical component (eye, finger, voice, hand, face) used to identify a person.").

camera, camera features, and default gallery app, all of which utilize facial processing and recognition technology and techniques before, during, and after images are captured.[24] Not only does LG use facial recognition to recognize faces in the user's camera frame, photo gallery, and contacts, but it also uses facial recognition to detect faces through LG's "smart features."

77. LG's built-in camera integrates several AI "smart features" including: (1) "Gesture Shot," (2) "Selfie shot," (3) "Beauty Effects" and "Beauty Shot," (4) "My Avatar," (5) "AR Emoji," (6) "AR Sticker," (7) "Makeup Pro," (8) "Auto Shot," (9) "Augmented Selfie," (10) "AI Composition," and (11) "AI Cam" (collectively "AR Features").

78. As illustrated in Figure 2 below, LG's "AI Cam" feature automatically scans the image to detect and extract key face features and feature points from the extracted facial region to calculate feature vectors that create a map of the individual's face based on their facial geometry.

79. Likewise, LG's "Auto Shot" feature automatically scans the image to detect a face by deploying a "focusing box" around each identified individual's face, as shown in Figures 2-4.

---

[24] See, e.g., Patent No.: US 10,375,219 B2: Mobile Terminal Releasing a Locked State and Method for Controlling the Same (Aug. 6, 2019) ("FIG. 11 shows an input of a control command to change an *image sorting through a face recognition, to an execution screen of a gallery applicatio*n. Referring to FIG. 11, in a state that a list 1101 of a plurality of thumbnail images is output without a specific sorting reference as a gallery application is executed, a user's pickup gesture may occur, and then a face detection and a face recognition may be performed. As a result, the list 1101 may be changed into a list 1102 of photo images including the recognized face, according to a subsequent face gesture (e.g., a nodding gesture)") (emphasis added); Patent No.: US 11,250, 869 B2: Audio Zoom Based on Speaker Detection Using Lip Reading (Feb. 15, 2022) ("After facial recognition is performed in a cloud server or edge computing environment, the result of facial recognition may be transferred to the electronic device. Or, facial recognition may be performed by applying a deep learning model to an image captured by the electronic device. […] *FIG. 9 is a view illustrating an example of detecting a speaker's utterance based on a variation in the mouth shape based on facial recognition*. Referring to FIG. 9, even the position of the mouth may be identified in the face recognized via an ANN. The ANN may be a model trained to detect variations in the shape of the mouth. *The ANN for facial recognition may detect a person's lips and extract feature points F1, F2…F10 from the detected lips.*") (emphasis added).



*Fig. 2*[25]



*Fig. 3*[26]

---

[25] https://www.lg.com/ca_en/cell-phones/g7/
[26] https://www.lg.com/ca_fr/telephones-mobiles/lgm151/ ("Recognizes up to 3 people and adjusts the picture composition").



*Fig. 4[27]*

80.     Moreover, like most facial recognition algorithms, LG's AR technology uses computer vision to learn how to recognize and track human faces by comparing the face of an individual taken in real-time to a template within the system.

81.     To apply an AR Feature, LG's algorithm first must detect a face. The system begins the process by repeatedly scanning the user's facial geometry to calculate pixel values to determine if a face is present. LG then takes an average face from its trained data set and aligns it with the image from the user's camera phone, scaling it and rotating it according to where the user's face is located. After detecting a face, the algorithm identifies and extracts key facial landmarks from the user's face. Following face detection and landmark extraction, facial recognition techniques are used to identify key landmark features to create a mesh mask or extract segments and apply Beauty Effects to the photo. This functionality is a form of AR.

---

[27] Exhibit B to Complaint, *NavBlazer, LLC v. LG Electronics, Inc. et al,* No. 6:2020-cv-00095, ECF No. 22-2 (June 23, 2020 W.D. Tex.).

82.     Similarly, to apply LG's AR features, LG's algorithm scans the user's facial geometry to detect and localize the face, identify and extract landmark features, and track the user's face and any movement and/or behavioral and emotional responses or reactions. This functionality allows users to edit their photos, videos, and facial characteristics. Users can experience Defendant's AR by adding real-time effects by switching the camera to selfie mode and tapping their faces on the screen. After seconds of scanning, a facial recognition pattern appears, allowing the user to select and apply facial animations. Examples of LG's AR features are depicted in Figures 5-6.

   

*Fig. 5[28]*   *Fig. 6[29]*

83.     LG's AR Features are powered by complex algorithms and systems, which integrate facial processing techniques that require the AI-powered features to repeatedly scan images to detect faces, identify key facial landmarks, and extract facial geometry from LG Device

---

[28] Creating and customizing My Avatar, ANDROIDAUTHORITY, https://www.androidauthority.com/wp-content/uploads/2018/11/My-Avatar.jpg
[29] https://www.lg.com/ca_en/cell-phones/lmg900um2-aurora-green/.

users. The repeated scanning and detection of faces is the first step of LG's facial recognition algorithm, and the information derived therefrom is later used to identify users by name and face templates. Thus, the type of biometric data and information collected by LG unambiguously falls squarely within the meaning of the term "face geometry."[30] To further evidence LG's use of facial recognition, LG has several patents that explain how LG captures its user's facial biometrics. For example, Patent No.: US 11,082,610 B2: Artificial Device and Method of Collecting Image of the Same (Aug. 3, 2021), explains:

> The processor may extract a reference point from a subject photographed through the camera. The subject may be a person or a face of a person. For example, ***the processor 180 may extract reference points (eyes, eyebrows, lips, glasses, etc.) from a face image. The processor 180 may detect a size of the face on a face coordinate system (x, y, z) generated based on the extracted reference point***..." *Id.* (emphasis added).

84. Similarly, Patent No.: US 11,416,715 B2: Apparatus and Method for Recognizing a Face Based on Artificial Intelligence (Aug. 16, 2022), describes how LG is able to use facial recognition as follows:

> Subsequently, for the respective detected facial image, the face recognition electronic apparatus may represent with whom the detected facial images respectively correspond among subjects 721, 723, 725, 727 stored in the database, and match probabilities 731, 733, 735, and 737 therewith.
>
> ***
>
> ***Referring to FIG. 7, the face recognition electronic apparatus according to the present disclosure, first, may detect facial images from an image captured by the sensor 130, and display boxes 711, 713, 715, and 717 on the detected facial images***. Subsequently, for the respective detected facial image, the face recognition electronic apparatus may represent with whom the detected facial images respectively correspond among subjects 721, 723, 725, 727 stored in the database, and match probabilities 731, 733, 735, and 737 therewith."
>
> ***

---

[30] *See* Belhumeur, *supra* note 14 ("Although faces come in different shapes, present themselves to the camera in many ways, and may possess often extreme facial expressions, there are strong anatomical and geometric constraints that govern the layout of face parts and their location in images.").

Subsequently, for the respective detected facial image, the face recognition electronic apparatus may represent with whom the detected facial images respectively correspond among subjects 721, 723, 725, 727 stored in the database, and match probabilities 731, 733, 735, and 737 therewith."); Patent No.: US 11,126,833 B2: Artificial Intelligence Apparatus for Recognizing User from Image Data and Method for the Same (Sept. 21, 2021) ("Referring to FIG. 13, a user 1301 may photograph a face using the camera included in the AI apparatus 1302 for facial recognition. In this case, the recognition target object is the face of the user. Here, the AI apparatus 1302 may output a message requesting facial recognition to the user 1301. In addition, the AI apparatus 1302 may acquire image data 1311 including the face of the user 1301, and may recognize the face of the user 1301 by extracting features 1312 for facial recognition from the image data 1311."

*Id.* (emphasis added).

85.     Likewise, Patent No.: US 11,250, 869 B2: Audio Zoom Based on Speaker Detection Using Lip Reading (Feb. 15, 2022) explains:

> After facial recognition is performed in a cloud server or edge computing environment, the result of facial recognition may be transferred to the electronic device. Or, facial recognition may be performed by applying a deep learning model to an image captured by the electronic device. […] ***FIG. 9 is a view illustrating an example of detecting a speaker's utterance based on a variation in the mouth shape based on facial recognition***. Referring to FIG. 9, even the position of the mouth may be identified in the face recognized via an ANN. The ANN may be a model trained to detect variations in the shape of the mouth. ***The ANN for facial recognition may detect a person's lips and extract feature points F1, F2…F10 from the detected lips.***"

*Id.* (emphasis added).

86.     The LG Devices at issue are also manufactured and sold with LG's high-powered camera ("Camera"). LG's Camera applies facial processing and recognition technology software before, during, and after images are captured.[31]

---

[31] *See, e.g.,* Patent No.: US 10,375,219 B2: Mobile Terminal Releasing a Locked State and Method for Controlling the Same (Aug. 6, 2019) ("FIG. 11 shows an input of a control command to change an ***image sorting through a face recognition, to an execution screen of a gallery application***. Referring to FIG. 11, in a state that a list 1101 of a plurality of thumbnail images is output without a specific sorting reference as a gallery application is executed, a user's pickup gesture may occur, and then a face detection and a face recognition may be performed. As a result, the

87.     Like most facial recognition algorithms, LG's technology uses computer vision powered by deep learning and machine learning for face detection, facial processing techniques, and facial recognition.[32] LG's Camera must detect and analyze faces to function. LG's Camera employs facial processing techniques by repeatedly scanning the image frame to detect a user's face. Specifically, once the LG Camera application is open, LG's facial processing and recognition software work by immediately scanning the image and/or video frames to detect human faces and objects. Once the face is detected, LG's proprietary algorithm scans its users' facial geometry to identify and extract key landmark facial features, such as the location of the mouth, chin, nose, ears, eyes, and eyebrows to calculate feature vectors between the elements and detect the face.[33] LG uses this information to create a "face map" or "face template" based on the identified individual's geometric attributes such as distance between the eyes and the width of the nose. The newly created face template is then compared to the face templates stored in LG's database to

list 1101 may be changed into a list 1102 of photo images including the recognized face, according to a subsequent face gesture (e.g., a nodding gesture)") (emphasis added); Patent No.: US 11,250, 869 B2: Audio Zoom Based on Speaker Detection Using Lip Reading (Feb. 15, 2022) ("After facial recognition is performed in a cloud server or edge computing environment, the result of facial recognition may be transferred to the electronic device. Or, facial recognition may be performed by applying a deep learning model to an image captured by the electronic device. […] ***FIG. 9 is a view illustrating an example of detecting a speaker's utterance based on a variation in the mouth shape based on facial recognition***. Referring to FIG. 9, even the position of the mouth may be identified in the face recognized via an ANN. The ANN may be a model trained to detect variations in the shape of the mouth. ***The ANN for facial recognition may detect a person's lips and extract feature points F1, F2…F10 from the detected lips.***") (emphasis added).

[32] *Id.* https://www.LGsolutions.com/en_us/solutions/what-is-ai.html ("Artificial Intelligence(AI) refers to the simulation of human intelligence that leverages computers and machines to mimic the problem-solving and decision-making capabilities of the human mind.")

[33] *See, e.g.,* Patent No. US 10,863,216 B2: Terminal Using Intelligent Analysis for Decreasing Playback Time Of Video (Dec. 8, 2020) ("As another example, the learning data unit 130 may detect facial elements and recognize the face 571. Specifically, the learning data unit 130 may pre-acquire the locations of the facial elements such as eyes, nose and mouth, calculate feature vectors between the elements, and detect the face 571...(219) The learning data unit 130 extracts the facial region from the recognized face (S542). The learning data unit 130 may extract the facial region 572 corresponding to the recognized face. The learning data unit 130 extracts a plurality of feature points from the extracted facial region (S543). In one embodiment, each of the plurality of feature points may be extracted from each of the facial elements (eyes, nose, mouth, eyebrows, forehead, etc.). Each of the plurality of feature points may be a reference point extracted in order to acquire the contour of the face.")

identify matches, which in some instances, include face images of individuals saved in the user's phonebook, address book, or gallery app.

88. Specifically, as described by US 9,977,590 B2: Mobile terminal and method for controlling the same, issued on May 22, 2018, LG scans the image to detect and recognize a specific face based on photographs saved in the user's address book, gallery app, and contact list. If there is a match, LG associates the image with the identified individual:

> When a specific image is output in the photo view mode, the controller 180 may recognize a face in the specific image. Then, the controller 180 compares the recognized face with face images saved in the phonebook, address book, etc. of the terminal. If there is a match, the controller 180 outputs on the recognized facial area a graphics object (e.g., focusing box) that recommends the recognized facial area as a specific area. For example, as shown in FIG. 4(*a*), the focusing box 410 may be initially output at a point corresponding to the user's touch gesture, or the focusing box 410 may be output on the corresponding facial area to recommend this area as a specific area for thumbnail creation when the face in the photographic image matches a face image saved in the terminal.

> \*\*\*

> FIG. 5A(a) to 5A(d) explain a concrete embodiment of a method for creating a thumbnail from a specific area based on a touch gesture on a photographic image according to an embodiment of the present invention. In the embodiments to be described hereinafter, it is presumed that the face recognition function is executed on the mobile terminal 100. When the face recognition function is executed, the controller 180 may detect information on the overall contour or skin tone of face and information on the features (e.g., length, location, angle, and shape) of the facial elements such as the eyes, nose, mouth, eyebrows, or ears from an image, in order to recognize a specific face.

> When a specific image is output in the photo view mode, the controller 180 may recognize a face in the specific image. ***Then, the controller 180 compares the recognized face with face images saved in the phonebook, address book, etc. of the terminal. If there is a match, the controller 180 outputs on the recognized facial area a graphics object (e.g., focusing box) that recommends the recognized facial area as a specific area***. For example, as shown in FIG. 4(*a*), the focusing box 410 may be initially output at a point corresponding to the user's touch gesture, or the ***focusing box 410 may be output on the corresponding facial area to recommend this area as a specific area for thumbnail creation when the face in the photographic image matches a face image saved in the terminal***. Upon sensing a touch gesture to hide a specific

face in a specific photographic image, the controller 180 may extract the hidden specific face as the specific area for thumbnail creation, or extract the area except for the hidden specific face as the specific area for thumbnail creation.

For example, referring to FIG. 5A(a), upon sensing a touch gesture to hide a specific figure from a specific photographic image 501 output, the controller 180 recognizes a specific face in an area where an abrupt change in illumination has occurred, according to illumination information transmitted from the sensing unit 140. Then, as shown in FIG. 5A(b), a pop-up window 550 that asks about processing the hidden specific figure is output. When the user chooses 'view' key 550 a in the pop-up window 500, a thumbnail list 570 is output in the bottom part of the photographic image 501, as shown in FIG. 5A(d). The thumbnail of the photographic image 501 shows 501 b″ only the hidden specific figure. On the other hand, when the user chooses 'hide' key 550 b in the pop-up window 500, a thumbnail list 570 is output in the bottom part of the photographic image 501, as shown in FIG. 5A(c)...

...Specifically, the controller 180 may create a folder (hereinafter, 'first folder') that is designated not to show the recognized face in a thumbnail and a folder (hereinafter, 'second folder') that is designated to expose the recognized face in a thumbnail or highlight it. According to the user's selection, the recognized face may be extracted as a specific area only from the corresponding image, or may be designated to belong to the first group or the second group. If the recognized face belongs to the first group, the controller 180 changes the thumbnails of images containing this face into thumbnails that do not display the recognized face.



Patent No.: US 9,977,590 B2: Mobile terminal and method for controlling the same (May 22, 2018) (emphasis added).

26



*Id.*

89. As depicted below, LG's smartphone device manuals confirm contact photos are assigned as picture ID's:

## Assign Pictures

After taking a picture, assign it as a picture ID for a Contacts entry or as the background image (wallpaper) for your Home screen or Lock screen.

1. Tap the Home Button ▢ > the Apps icon ▢ > Gallery ▢.

2. Tap an album and tap an image to view it.

3. With the picture displayed, tap the screen > the Menu icon ▢ > Set image as.

4. Select an option.

  ◦ Contact photo assigns the picture to a Contact entry as a picture ID. Tap an entry from Contacts, crop the image, then tap OK to assign the picture.

  ◦ Lock screen wallpaper assigns the picture as the background image for your Lock screen. Crop the image, tap OK, then tap YES to assign the picture.

  ◦ Home screen wallpaper assigns the picture as the background image. Crop the image, tap OK, then tap YES to assign the picture.

  ◦ Wallpaper assigns the picture as the phone's background image. Tap SET WALLPAPER to assign the picture.

NOTE

  • The first time you assign a picture, may be asked which app to use and also if you want to use it Just once or always. The procedure for setting the image will depend on the app selected.

  • When assigning a picture as the Home screen background, the Crop picture app has additional choices such as dividing the picture across the screen panels (Stationary photo ▢ or Slide photo ▢) and allowing you to set it as the Lock screen background at the same time.

*Fig. 7[34]*

---

[34] LG, https://www.lg.com/us/mobile-phones/VS990/M/Userguide/260.html (last accessed June 20, 2025).

90.     Similarly, Patent No.: US 10,375,219 B2: Mobile Terminal Releasing a Locked State and Method for Controlling the Same (Aug. 6, 2019), explains that LG's algorithms utilize facial recognition technology to sort through the user's default photo "gallery application":

> FIG. 11 shows an input of a control command to change an ***image sorting through a face recognition, to an execution screen of a gallery applicatio**n.* Referring to FIG. 11, in a state that a list 1101 of a plurality of thumbnail images is output without a specific sorting reference as a gallery application is executed, a user's pickup gesture may occur, and then a face detection and a face recognition may be performed. As a result, the list 1101 may be changed into a list 1102 of photo images including the recognized face, according to a subsequent face gesture (e.g., a nodding gesture).

*Id.* (emphasis added).

91.     LG further uses facial recognition to detect "facial expressions" during the unlocking phase of the smartphone and to control LG's touch screens, as described by Patent No: 10,375,219 BS: Mobile Terminal Releasing for A Locked State and Method for Controlling the Same, issued on August 6, 2019:

> 8. The mobile terminal of claim 1, wherein the controller is further configured to:

> recognize a facial expression of the detected face during the face recognition of the detected face; and control the touch screen to display an execution screen of a particular application mapped with the recognized facial expression when the locked state is released.

> 9. The mobile terminal of claim 1, wherein the controller is further configured to:

> recognize a facial expression of the detected face during the face recognition of the detected face; identify an emotion associated with a change in the recognized facial expression; and control the touch screen to display an image mapped with the identified emotion when the locked state is released.

92.     Thus, the type of biometric data collected through LG's Camera is precisely within the meaning of the term "face geometry," "face scan," and biometric data as defined under BIPA.

93.     Accordingly, LG collects Plaintiff's Biometrics through LG's Camera and AR Features. *See* 740 ILCS 14/10.

94.     Moreover, in direct violation of §§ 15(b)(2) and 15(b)(3) of BIPA, LG never informed users, including Plaintiff—who had his biometric data collected—of the specific purpose and length of term for which his biometric identifiers or information would be collected, stored, and used, nor did LG obtain a written release from any of these individuals.

95.     In direct violation of § 15(a) of BIPA, LG does not have written, publicly available policies identifying their retention schedules, or guidelines for permanently destroying biometric identifiers or information.

**B.      LG Does Not Provide Notice of Its Use of Facial Processing and Recognition Techniques or Technology as Required Under BIPA**

96.     As LG's Camera and AR Features apply facial scanning and facial recognition technology automatically to all photos and videos, LG Device users cannot disable the feature nor consent to its uses.  This is an automated process that occurs without the user's involvement or consent whenever a new photograph is stored on an LG Device.  Users cannot disable or opt-out of this facial recognition technology, nor can they prevent LG from harvesting the biometric identifiers (*i.e.,* scans of face geometry) from the photographs stored on their LG Devices.

97.     LG provides no mechanism by which anyone may opt out of this process. Consumers who buy LG Devices own the hardware but merely license the software necessary for the device to function.  That software is wholly owned and controlled by LG, as confirmed by LG's legal warranty information, which provides, in pertinent part: "Modifying the device's operating system or installing software from unofficial sources may damage the device and lead to data corruption or data loss. Such actions will violate your LG license agreement and void your warranty."[35]

---

[35] *See, e.g.,* LG User Guide, https://www.lg.com/us/support/products/documents/LG-H820_ATT_Eng_UG_D03_160316-1.pdf (last accessed July 22, 2025).

98.     Because disabling facial recognition is not permitted by LG, the use of LG Devices to take or store photographs is ***conditioned*** on the collection of biometrics.

99.     LG collects biometrics for all photographic subjects, including both customers and non-customers incapable of providing informed consent.

100.     Although, on information and belief, LG does not store or transfer all user biometrics on or by means of its servers, it has complete and exclusive control over the biometrics collected and stored on LG Devices. To be clear, LG controls:

(a)     Whether biometric identifiers are collected;

(b)     What biometric identifiers are collected;

(c)     The type of biometrics that are collected and the format in which they are stored;

(d)     The facial recognition algorithm that is used to collect biometrics;

(e)     What biometrics are saved;

(f)     Whether information based on biometric identifiers is used to identify users (thus creating biometric information);

(g)     Whether biometrics are kept locally on users' LG Devices;

(h)     Whether biometrics are encrypted or otherwise protected; and

(i)     How long biometrics are stored.

101.     The user of an LG Device, in contrast, has no ability to control the biometrics on the user's LG Device.  The user has no control over whether biometrics are collected from the user's photo library.  Users cannot disable the collection of biometrics or limit what information is collected or from whom it is collected.  Thus, LG fully controls—and thus possesses—the biometrics on LG Device.

### C.  LG's BIPA Violations Expose Claimant to Threats of Serious Harm

102.    LG does not delete the biometrics it collects, which are located on numerous devices in this State.  An LG Device user's biometrics may be stored on one or more LG Device in use, as well as on discarded LG Devices.

103.    Furthermore, even non-users' biometrics that LG collects may be stored on one or more LG Devices, as well as on discarded LG Devices.  For example, an Illinois resident's biometrics may be stored on his or her own LG Device(s) and/or on the LG Devices of his or her family members, relatives, friends, coworkers, and anyone else who photographed him or her using an LG Device or stored a photograph of him or her on an LG Device.  Information stored in a central location, such as a server, could present a single breach threat, though a sophisticated entity may take measures to securely store the information.

104.    By contrast, as a result of the fact that the biometrics LG collects are stored on numerous devices, Plaintiff and non-users alike face the imminent threat of disclosure of their biometrics as a result of a data breach on *any* one of the LG Devices.

105.    Indeed, many of the LG Devices used in this State have collected the biometrics of multiple individuals other than the LG Device user.  Consequently, numerous Illinois residents have their biometrics stored on one or more LG Devices outside their control.

106.    The durability of the memory in LG Devices creates a near-permanent risk of a data breach of biometric identifiers and information for both device users as well as nonusers whose biometrics have been collected.  LG Devices utilize solid state memory, which can withstand drops, extreme temperatures, and magnetic fields.[36]

---

[36] Roderick Bauer, *SSD 101: How Reliable are SSDs?,* BACKBLAZE (Feb. 21, 2019), https://www.backblaze.com/blog/how-reliable-are-ssds/.

107. Unless corrupted, this solid state memory and the information it contains can last in perpetuity. Thus, the biometrics on LG Devices will likely outlast the device battery, the functionality of the device screen, and the natural life of the device user.

108. Biometrics may persist on discarded LG Devices, which could be extracted by malicious actors using methods of removal that may or may not currently exist.[37] The risk of illicit harvesting of biometrics from discarded LG Devices therefore extends far into the future.

## V. PLAINTIFF'S EXPERIENCE WITH LG DEVICES

109. Plaintiff is an LG Device user.

110. Plaintiff purchased and used LG Device models LG Stylo 5 and LG G3 ThinQ.

111. Plaintiff used the LG Device to capture numerous photos and videos of himself, including his face, using LG's Camera and/or AR Features.

112. Plaintiff was never notified of and has never consented to LG's use, collection, and storage of Plaintiff's Biometrics.

113. Plaintiff did not request or give permission – written or otherwise – to LG to collect or store biometric identifiers, nor did Plaintiff receive or sign a written release allowing LG to collect or store biometric identifiers.

114. LG never informed Plaintiff by written notice or otherwise that Plaintiff could prevent LG from collecting, storing, or using biometric identifiers.

115. Likewise, LG never provided Plaintiff with an opportunity to prohibit or prevent the collection, storage, use, or sharing of Plaintiff's face geometry or associated biometric information.

---

[37] *See, e.g.*, Josh Frantz, *Buy One Device, Get Data Free: Private Information Remains on Donated Tech,* Rapid7 Blog (Mar. 19, 2019), https://www.rapid7.com/blog/post/2019/03/19/buy-one-device-get-data-free-privateinformation-remains-on-donated-devices; Federal Trade Commission, *How to Protect Your Phone and the Data On It*, https://www.consumer.ftc.gov/articles/how-protect-your-phone-and-data-it.

116. LG never advised Plaintiff in writing, or otherwise, of any policy to destroy the biometric identifiers that LG collected and stored of Plaintiff's face, eyes, and voice.

117. Nevertheless, when Plaintiff captured and/or uploaded photos and videos, LG automatically detected and located Plaintiff 's face, analyzed the geometric data relating to the unique contours of Plaintiff's face and the distances between Plaintiff's eyes, nose, and ears, and used that data to extract and collect Plaintiff's scan of face geometry and Plaintiff's Biometrics.

118. As a result of LG's unauthorized collection and use of Plaintiff's biometric identifiers, Plaintiff was deprived of control over that valuable information.

## CLASS ALLEGATIONS

119. **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All residents of Illinois who had their biometric information and/or biometric identifiers, including their face geometry, collected, captured, used, stored, or otherwise obtained by LG at any point in the five (5) years preceding the filing of the complaint.

120. Excluded from the class are:

(a) Any individual who provided notice to Defendant LG of an intent to file a demand for arbitration, or filed a demand for arbitration against LG, alleging allegations substantially similar to those contained herein, individually or through any firm other than undersigned counsel Labaton Keller Sucharow LLP, unless such notice of intent or demand has been withdrawn;

(b) Any individual who has settled claims against LG based on allegations substantially similar to those contained herein;

(c) Any Judge or Magistrate Judge presiding over this action and any members of their immediate families;

(d)     The current or former employees, officers, directors, and control persons of LG, and any members of their immediate families;

(e)     Plaintiff's counsel, Defendant's counsel, or any counsel representing any individual described in subparagraph (a) of this paragraph above with respect to claims described in subparagraph (a) of this paragraph above; and

(f)     The legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.[38]

121.    **Numerosity:** Pursuant to Rule 23(a)(1), the number of persons within the Class is so numerous, believed to amount to thousands of persons, that joinder of all members is impracticable.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from LG's records.

122.    **Commonality, Predominance, and Typicality:** Pursuant to Rule 23(a)(2)-(3) and Rule 23(b)(3), there are well-defined common questions of fact and law that exist as to all Class Members, and that predominate over any questions affecting only individual Class Members, and may be determined without reference to the individual circumstances of any particular Class Member.  These common legal and factual questions include, but are not limited to:

(a)     Whether LG collected or otherwise obtained Plaintiff and Class Members' biometric identifiers or biometric information;

(b)     Whether LG properly informed Plaintiff and Class Members that it collected, used, and stored their biometric identifiers or biometric information;

---

[38] Plaintiff reserves the right to modify, change, or expand the Class definition or to define subclasses based upon discovery and further investigation.

(c)     Whether LG obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff and Class Members' biometric identifiers and biometric information;

(d)     Whether LG used Plaintiff and Class Members' biometric identifiers and biometric information to identify them; and

(e)     Whether LG's violations of BIPA were committed intentionally, recklessly, or negligently.

123.    **Adequate Representation:** Pursuant to Rule 23(a)(4), Plaintiff has retained and is represented by qualified competent counsel who is highly experienced in complex consumer class action litigation.  Plaintiff and his counsel are committed to vigorously prosecuting this Action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims of the type reasonably expect to be raised by members of the Class and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Complaint to include additional Class representatives to represent the Class, additional claims as may be proper, or to amend the Class definition or add a sub-class to address any steps Defendant engaged in with respect to Plaintiff and the Class Members' biometric identifiers and biometric information.

### COUNT I

### Violation of the Illinois Biometric Information Privacy Act
### (Violation of 740 ILCS 14/15(a))

124.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

125.    Section 15(a) of BIPA requires that any:

private entity in possession of biometric identifiers . . . must develop a written policy, made available to the public, establishing a retention schedule and

guidelines for permanently destroying biometric identifiers . . . when the initial purpose for collecting or obtaining such identifiers . . . has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

126.    LG does not publicly provide a retention schedule or guidelines for permanently destroying Plaintiff's or the Class's biometric identifiers as specified by BIPA.  *See* 740 ILCS 14/15(a).

127.    Consequently, LG does not comply with any established retention schedule or destruction guidelines. *Id.*

128.    On behalf of himself and the Class, Plaintiff seeks: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring LG to establish and make publicly available a policy for the permanent destruction of biometric identifiers compliant with 740 ILCS 14/15(a); (ii) statutory damages of $5,000 for every intentional violation of BIPA pursuant to 740 ILCS 14/20(2), or at minimum, $1,000 for every negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (iii) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## <u>COUNT II</u>

### Violation of the Illinois Biometric Information Privacy Act
### (Violation of 740 ILCS 14/15(b))

129.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

130.    BIPA makes it unlawful for any private entity to, among other things,

(b) collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

(1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

(2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

. . . .

[and further,] (d) No private entity in possession of a biometric

identifier or biometric information may disclose, redisclose, or otherwise

disseminate a person's or a customer's biometric identifier or biometric

information unless:

(1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure[.]

740 ICLS 14/15(b) and (d).

131.     LG is a Delaware corporation and thus qualifies as a private entity" under BIPA.

*See* 740 ILCS 14/10.

132.     LG violated section (b) in three ways by: (1) generating, (2) collecting, and (3)

storing Plaintiff's and the Class's biometric data and information without consent.

133.     As explained in detail in Sections III-IX, Plaintiff's and the Class's faceprints and

face geometry are "biometric identifiers" pursuant to 740 ILCS 14/10. Additionally, any voice and

facial features or data extracted from Plaintiff in a measurable or identifying form constitute

"biometric information" pursuant to 740 ILCS 14/10.

134.     LG systematically and automatically collected, used, and stored Plaintiff's and the Class's biometric identifiers without first obtaining the specific written release required by 740 ILCS 14/15(b)(3) and (d).

135.     As explained above, LG did not properly inform Plaintiff or the Class in writing that Plaintiff's and the Class's biometric identifiers were being collected and stored, nor did it inform Plaintiff or the Class in writing of the specific purpose and length of term for which these biometric identifiers were being collected, stored, and used, as required by 740 ILCS 14/15(b)(1)–(2).

136.     Plaintiff and the Class seek: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring LG to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers; ii) statutory damages of $5,000 for an intentional violation of 740 ILCS 14/15(b) of BIPA pursuant to 740 ILCS 14/20(a)(2), or at minimum, $1,000 for a negligent violation of BIPA pursuant to 740 ILCS 14/20(a)(1); and (iii) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## <u>COUNT III</u>

**Violation of the Illinois Consumer Fraud and Deceptive Practices Act,
Based on LG's BIPA Violation
(Violation of 815 ILCS 505/10a(c))**

137.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

138.     LG violated the Illinois Consumer Fraud and Deceptive Business Practices Act by engaging in unlawful, unfair and deceptive business acts and practices.

139.   Specifically, LG committed unfair and deceptive acts by surreptitiously generating, collecting, and storing Plaintiff's private information and data, which is a form of personal information under 815 ILCS 530/5.

140.   By surreptitiously generating, collecting, and storing Plaintiff's personal information, specifically biometric data, without express notice or consent, LG has violated the Illinois Consumer Fraud and Deceptive Business Practices Act.  *See* 815 ILCS 530/20; 815 ILCS 505/10a(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully request that the Court enter an Order:

(a)   Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representatives of the Class, and appointing Labaton Keller Sucharow LLP as Class Counsel for the Class;

(b)   Declaring that LG's actions, as set forth above, violate BIPA, 740 ILCS l4/1-99.

(c)   Awarding statutory damages of $5,000 per intentional or reckless violation of BIPA pursuant to 740 ILCS 14/20(a)(2) and statutory damages of $1,000 per negligent violation of BIPA pursuant to 740 ILCS 14/20(a)(1);

(d)   Awarding injunctive relief and other equitable relief as is necessary to protect the interests of Plaintiff, including, *inter alia*, an order requiring LG to collect, store, use, and share biometric identifiers or biometric information in compliance with BIPA, and permanently destroy the biometric identifiers and biometric information that LG has collected from Plaintiff and the Class pursuant to 740 ILCS 14/20(a)(4);

(e)     Awarding Plaintiff and the Class reasonable litigation expenses and attorneys' fees pursuant to 740 ILCS 14/20(a)(3);

(f)     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable pursuant to 740 ILCS 14/20(a)(4); and

(g)     Awarding such other and further relief as equity that the Court may deem appropriate pursuant to 740 ILCS 14/20(a)(4).

## **JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Dated: July 28, 2025

Respectfully submitted,

**WALLACE MILLER**

By:  */s/ Mark R. Miller*

Mark R. Miller
Matthew J. Goldstein
200 W. Madison St.
Suite 3400
Chicago, IL 60606
Telephone: 312-663-8282
mrm@wallacemiller.com
mjg@wallacemiller.com

*Local Counsel for Plaintiff and the Proposed Class*

**LABATON KELLER SUCHAROW LLP**

Jonathan Gardner (*pro hac vice*
forthcoming)
Carol C. Villegas (*pro hac vice*
forthcoming)
Jonathan D. Waisnor (*pro hac vice*
forthcoming)
James M. Fee (*pro hac vice* forthcoming)
Danielle Izzo (*pro hac vice* forthcoming)
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
cvillegas@labaton.com
jwaisnor@labaton.com
jfee@labaton.com
dizzo@labaton.com

*Counsel for Plaintiff and the Proposed
Class*